WILLIAM EDWARD TROWBRIDGE, Respondent, v. KANSAS CITY & WESTPORT BELT RAILWAY, Appellant.

Kansas City Court of Appeals, October 4, 1915.

1. DAMAGES: Negligence: Personal Injuries: Federal Employer's Liability Act: Interstate Commerce. To create a right of recovery under the Federal Employer's Liability Act, the employer must be a common carrier by railroad, engaged in interstate commerce, and the injury to the employee must have occurred when the particular service in which the employee is engaged is a part of interstate commerce. In this case the employer was a common carrier by railroad engaged in interstate commerce. The road was nine miles in length lying wholly within the State of Missouri, but its western terminus was but a short distance from the Kansas line. At this point it connected with three other roads coming from other States and hauling freight billed to this terminus but which in fact went on through to points along defendant's line in Missouri. Defendant's duty was to take the shipments from this terminus to the consignees along its line, afford the latter switching facilities and then return the empty cars to the said terminus where they were again taken, by the road bringing them to defendant, and carried westward into Kansas to re-enter the stream of eastward commerce. Plaintiff was injured while switching one of these empty cars, which had come in loaded from Kansas, preparatory to returning the car to its terminus where it would be taken, and in fact was so taken, to Kansas

for use in the shipment of wheat. *Held* that the movement of the empty car by the defendant at the time plaintiff was hurt, was a completion of the circuit the car was making in the transportation of the country's commerce, and hence the Federal act applied, since the plaintiff was engaged in interstate commerce at the very time of his injury.

2. ———: ———: ———: ———: ———: **Empty Cars.** It is the nature of the service performed by the carrier and not the way goods are billed that determines whether the carriage is interstate or not. And the hauling of empty cars from one State to another is interstate commerce within the meaning of the act.

3. ———: ———: ———. Plaintiff, standing on the footboard of an electric switch engine, and approaching a car about to be coupled, saw that the couplers were not in alignment, thus allowing the drawheads to pass each other and subjecting plaintiff to the danger of being crushed. He gave the engineer a signal to stop in time for the latter to have done so had he observed and obeyed the signal. Seeing that the engine was not going to stop, plaintiff kicked the drawhead on the engine and his foot was crushed. *Held,* that the negligence of the engineer in failing to stop was the cause of the injury, and that plaintiff was entitled to recover.

4. **PLEADING: Safety Appliance Act.** Although the petition alleged that the couplers would not meet and referred to the "condition of the couplers" yet the petition further alleged that this arose because of the poorly ballasted roadbed which caused the engine to sway from side to side and allow the couplers to pass each other. There was no allegation of any defect inherent in the coupler. Hence the cause of action stated was not based upon the violation of the Safety Appliance Act but is based solely upon the engineer's negligence in the operation of his engine. *Held,* also, that there was sufficient evidence of the engineer's negligence to take the case to the jury.

5. ———: ———: ———: **Contributory Negligence: Assumption of Risk.** Under the third section of the Employer's Liability Act, contributory negligence is not a complete defense but operates only to reduce the damages. Under the Federal act in question there is a distinction between contributory negligence and assumption of risk. The former term involving the nature of some fault or breach of duty on the part of the employee and the failure to use such care for his safety as ordinarily prudent employees under similar circumstances would use; while assumption of risk may be free from any suggestion of fault or negligence on his part. In this case, therefore, plaintiff's act in kicking the coupler constituted contributory negligence, if anything, rather than assumption of risk, and since it is only when the

injury is due solely to the negligence of the employee that such fault on his part will preclude a recovery, and since plaintiff's act in kicking the coupler was not the sole cause of the injury, he should not be debarred from recovery on the ground of contributory negligence.

Appeal from Jackson Circuit Court.—*Hon. W. O. Thomas*, Judge.

AFFIRMED.

*John H. Lucas, Chas. N. Sadler* and *C. A. Stratton* for appellant.

*Watson, Gage & Watson* and *Wright & Alford* for respondent.

TRIMBLE, J.—In this case damages are sought, under the Federal Employer's Liability Act, for personal injuries received by plaintiff while employed as a switchman in defendant's yard.

The principal contention of the defendant, and the one to be first considered, (since it will effectually dispose of the case if defendant is right), is that plaintiff was not engaged in interstate commerce at the time he received his injury. To create a right of recovery under the Federal act in question, not only must the employer be a common carrier by railroad engaged in interstate commerce, but the injury must have occurred "when the particular service in which the employee is engaged is a part of interstate commerce." [Illinois Central R. Co. v. Behrens, 233 U. S. 473.]

There is no question but that defendant was, and is, a common carrier by railroad and it was, and is, engaged in interstate commerce. Defendant's railroad is about nine miles long and extends from 39th street and Westport avenue in Kansas City, Missouri, to Dodson, Missouri. This last-named point is not far from the Kansas line. At Dodson the road connects with the Missouri Pacific, the Kansas City Southern,

and the St. Louis & San Francisco railroads.　It receives .freight in carload lots coming from points on these railroads outside of the State of Missouri consigned to points on defendant's line of railway within this State.　Defendant operated its road under a regular tariff filed with the Interstate Commerce Commission, and under this tariff collected its charges on all cars that came to it from Kansas or elsewhere outside of Missouri.　These incoming cars were billed to Dodson, Missouri, but as a matter of fact, they went on through to the various points along defendant's line of railway, being transported by defendant from Dodson to their various destinations.　When cars thus received and transported had been unloaded by their consignees, defendant took them back to Dodson and set them on its switches from whence they were taken by the particular connecting road over which they had come to defendant's line.　Empty cars, thus taken back to Dodson by defendant, were not billed to any point, but were merely taken there where the road which had brought them loaded to defendant either sent them back to point of origin or elsewhere as it chose.　Defendant, in bringing the empty cars back to the road it got them from, did so without ascertaining or inquiring where they were going after being taken charge of by the connecting road.

On July 3, 1913, a box car loaded with brick and consigned to Coen Building Material Company, located on defendant's line, was received at Dodson, Missouri, by defendant, having been shipped from Buffville, Kansas, over the Missouri Pacific, and was transported from Dodson by defendant to its consignee.　The car was unloaded, and on July 8th plaintiff was injured while engaged, as an employee of defendant, in switching the car preparatory to returning it to Dodson to be there again taken charge of by the Missouri Pacific. At that time the Missouri Pacific Railroad Company had given orders at Dodson that all box cars should be

sent west to a point in Kansas to be there loaded with wheat. After plaintiff's injury, the car he was attempting to couple was on the same day taken to Dodson from whence it was on the 9th of July, by the Missouri Pacific Railroad, sent west to Osawatomie, Kansas, the place where said road was at that time sending every freight car suitable for hauling wheat to eastern markets, and from which place said cars were distributed to the points where they were needed for that purpose. The evidence further shows not only that that car, but others coming in loaded from Kansas, came on through Dodson, without unloading, to their destinations at points along defendant's line in Missouri, and that after defendant had delivered them to their consignees and they had been unloaded, defendant would return the cars to the Missouri Pacific at Dodson and from thence they would be taken west to the point from whence they originated. The train that took the particular car in question west from Dodson, Missouri, to Osawatomie, Kansas, was a local freight which ran every day from Osawatomie, Kansas, to Kansas City, Missouri, and return. Cars going west on that local went to Osawatomie from whence they were distributed to various points as herein before stated.

The disputed question now under consideration is whether the movement of the particular car sought to be coupled at the time of the injury was a part of interstate commerce. If so, then the particular service being rendered by the plaintiff, at the time he was hurt, was a part of such commerce, and, in that event, the Federal act applies.

Had the injury occurred during the movement of the loaded car prior to its delivery to the consignee, there could be no question but that plaintiff would have been engaged in interstate commerce. The shipment of the brick from Buffville, Kansas, to the Coan Building Material Company at a point on defendant's line in Missouri constituted interstate commerce; and

the carrying of such loaded car by defendant from Dodson and its delivery to the consignee was a participation by defendant in such commerce. This is true notwithstanding the fact that the car was billed only to Dodson. While it and all other cars were billed to this point, yet, as stated, they went on through to the various consignees located along defendant's railroad. The work of defendant in taking the loaded cars from Dodson to the consignee on its route and then returning it after it had been unloaded to Dodson where it could be again taken possession of by the railroad over which it had come to defendant's line, was a participation by defendant in interstate commerce. And for this service it collected a charge from the Missouri Pacific which was included in the freight bill collected by the latter for the entire transportation. The carrying of the loaded car over the nine miles of defendant's road from Dodson to Westport avenue was as necessary a part of the carriage between shipper and consignee as the carriage from Buffville to Dodson. In performing the above-mentioned part of the transportation the defendant was also furnishining switch and terminal facilities for this shipment and for all others coming to it from the railroads connecting with it at Dodson. In the Interstate Commerce Act, as it now exists, the term "railroad" is defined to include "all switches, spurs, tracks, and terminal facilities of every kind used or necessary in the transportation of persons or property . . . and all freight depots, yards and grounds used or necessary in the transportation or delivery of any of said property." So that the participation by the defendant in the transportation of this shipment was undoubtedly a participation in interstate commerce. And this is true regardless of the fact that the car was billed to Dodson. Neither it nor other cars stopped there but went on through to the point of delivery. It is the nature of the service performed by the carrier and not the way in which goods are billed

that determines whether the carriage is interstate or not. [Ohio Railroad Commission v. Worthington, 225 U. S. 101; Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U. S. 498.] The service performed by the defendant in the case at bar is quite of the same nature as that performed by the Chicago Junction Railway Company and the Union Stockyard & Transfer Company in the case of the United States v. Union Stockyard & Transfer Co., 226 U. S. 286. The railway in that case operated wholly within the city of Chicago and neither of the corporations issued through bills of lading. The Supreme Court held that the fact that the service is performed wholly in one State makes no difference if it is a part of interstate commerce; that "it is the character of the service rendered, not the manner in which the goods are billed, which determines the interstate character of the service;" and that the corporations were engaged in interstate commerce.

However, in the case now before us, plaintiff's injury occurred after the car had been unloaded and while he was switching it preparatory to taking it back to Dodson where it could be taken possession of by the Missouri Pacific. Was the movement of this empty car a part of interstate commerce? We are of the opinion that it was under the circumstances disclosed by this case. In the first place, the service undertaken by the defendant when it received the loaded car from the Missouri Pacific at Dodson was not finished until it had transported the car to its consignee and had returned it empty to Dodson and placed it again at the disposal of the Missouri Pacific. Under these circumstances the particular trip of this car from Buffville, Kansas, might be said not to have ended until it was returned empty to Dodson, since it was not the purpose of anyone that the car, when unloaded, should remain at the point of delivery to the consignee. The return of the car to Dodson was a necessary part

of the movement of any cars carrying commerce from the State of Kansas to points in Missouri on defendant's line. To enable the railroad, bringing freight from Kansas to such points, to continue that commerce, certainly the cars, after they have been received and emptied of their goods, must be returned to that road. However, there is more in the facts of this case than simply the return of the car to Dodson, and we need not go so far as to hold that its mere return to Dodson was a part of its incoming trip and, therefore, a part of the interstate commerce of that trip. In this case the Missouri Pacific road had directed that all box cars returned to Dodson should be sent to its distribution point at Osawatomie, Kansas, for use in the transportation of wheat. The car in question was not one belonging to the Missouri Pacific, but belonged to the Delaware, Lackawanna & Western Railway (an eastern railroad). When the car was unloaded at the Coen Building Material Company's plant and started by defendant to Dodson, the defendant was in fact participating in its return to Kansas where it was to again enter the stream of incoming cars used in further transportation. This westward movement was merely a completion of the circuit it was making in the transportation of the country's commerce. On its return empty from the switch of its consignee, its passage through Dodson to the west was accomplished in the same way it went through Dodson east to its consignee. Dodson was no more its final destination in the one case than in the other. The fact that the defendant took no interest in where the car was going the moment it reached Dodson, nor made any inquiry in regard thereto ought not to make any difference in the real nature of the service then being rendered. It was then performing a service in the interstate commerce of the country. And in view of the fact that Dodson was so near the Kansas line with only one small station between it and that State, it is difficult to believe that

defendant was wholly ignorant of the fact that it was helping in the interstate movement of such cars even though its officers were careful to avoid ascertaining to what particular point in Kansas the cars were being sent. It is not the intent with which the carrier performs its work that affects the nature of the carriage; it is the service that is actually rendered. This is what determines whether it is inter-or intra-state. The empty cars, having brought its load from Kansas into Missouri, had entered upon its return to that State there to be again loaded. It was an instrumentality of interstate commerce, made so by the Federal statute which defines transportation to include "cars and other vehicles and all instrumentalities and facilities of shipment or carriage irrespective of ownership or of any contract express or implied for the use thereof and all services in connection with the receipt, delivery, elevation, and transfer in transit . . . and handling of property transported." The hauling of empty cars from one State to another is interstate commerce within the meaning of the Act. [North Carolina R. Co. v. Zachary Admr., 232 U. S. 248.] In Pennsylvania R. Co. v. Knox, 218 Fed. 748, empty cars belonging to the Pennsylvania Railroad were delivered to it in New York. In railroad parlance whenever cars belonging to a road were delivered to it at any point on its line, the cars were "at home." These cars were transported from New York into Pennsylvania. The court said the movement of empty cars was an operation of commerce and that, where the movement was interstate, the Act of Congress now in question would apply. The court also held that if the cars had been sent from New York to any particular point in Pennsylvania their interstate journey would not cease until that point was reached, and had the injury there complained of (which occurred in switching the cars after they had reached points in Pennsylvania where they had waited and were available for use by their owner),

occurred before that particular point had been reached, the switching would have been a part of interstate commerce. The cars were not billed at all, and, therefroe, the court looked into their actual movement and ascertained what was in fact done with them to determine the nature of that movement. The court said if the end of the journey is not in fact expressly determined "the law must determine it in accordance with what is reasonable and just," and, in commenting on the Zachary case, said that the court in that case "found it to be a reasonable inference that the cars then in question were in process of being carried forward as a part of a through movement of interstate commerce." The same method is applicable to the case at bar. The car in question came in from Kansas loaded with brick billed to Dodson but in fact went on through to its consignee at a point on defendant's line near Westport avenue, the defendant participating in that carriage by taking the car from Dodson to the consignee and returning it empty to Dodson where the Missouri Pacific again took it back to its point of distribution in Kansas. There was no billing of the car either way. But an examination into what was actually done shows that the car was making a complete circuit between the two states in the carrying of commerce and that defendant's part of the carriage was in transporting and handling of that car at the eastern end of that loop. In the case of Baer Bros. v. Denver & Rio Grande R. Co., 233 U. S. 479, shipments of beer were made from St. Louis, Missouri, to the plaintiff in Leadville, Colorado, but the shipments were billed from St. Louis to Pueblo where they were there taken by the Denver & Rio Grande, as an independent shipment originating at Pueblo, and forwarded by it on a local waybill. The Denver & Rio Grande, therefore, claimed that its part of the transaction was intrastate. The court refused to recognize this view, and looked into what was the actual nature of the transaction in

order to determine whether defendant's part of the carriage was intrastate or interstate, and held that "while there was no through rate and no through route, there was in fact a through shipment from St. Louis, Missouri, to Leadville, Colorado. Its interstate character could not be destroyed by ignoring the points of origin and destination, separating the rate into its component parts, and by charging local rates and issuing local waybills, attempting to convert an interstate shipment into intrastate transportation." In view of all the circumstances under which the car in the case at bar was moved, therefore, we are of the opinion that plaintiff was engaged in interstate commerce at the very moment of his injury.

This brings us to the facts concerning the happening of the injury itself. The switching was done with an electric engine both ends of which were alike, the engineer's cab being in the middle so that either end could be used as the front of the engine as occasion required. Across each end of said engine was a footboard about ten inches in width and above this footboard at the proper height was a rod for a handhold for the person standing on said footboard.

The car in question was on a sidetrack west of and next to defendant's main line and access to this track was by means of a switch at the north end. North of the car in question and about fifteen feet from it were three loaded cars on this sidetrack. The plaintiff opened the switch and let the engine in onto the sidetrack and walked down to the loaded cars and coupled the engine to them and then these loaded cars were pushed down and coupled to the empty car sought to be obtained. This coupling was made by another employee and plaintiff says there was some difficulty in making it. The empty and the loaded cars were then taken north over the switch to the main line where the empty car in question was shunted down the main line past the switch and the loaded cars were again

placed on the sidetrack. Plaintiff then opened the switch to let the engine on to the main line and, as it came south thereon, got on the front footboard and rode down to the car. In this position he was in front of the engine and of course when it and the car would come together he would be between the two. Both the engine and the car were equipped with automatic couplers which the Federal Safety Appliance Act requires shall couple automatically by impact. When the engine was about twelve feet from the car plaintiff noticed that the drawbar and coupler on the car was over to one side, so much so that it would not meet the one on the engine. Thereupon he gave the engineer the signal to stop in order that the car coupler could be adjusted, but this was not obeyed. Plaintiff continued to signal but, as the engine continued on its way unchecked, plaintiff, fearing that the drawheads would pass each other and he would be crushed, kicked the drawhead on the engine to the west to enable it to meet the one on the car. In doing so his foot slipped and the fleshy part of the ball of his foot was crushed. Plaintiff's kick succeeded in getting the two couplers so they would not pass but they did not couple whether because of the interposition of plaintiff's foot or because they were not sufficiently in line does not appear. The engine was moving at the rate of three or four miles per hour, and, according to the evidence, could have been stopped in from two to five feet. The engineer admits he got a signal to stop but says it was when the engine was within two feet of the car while plaintiff says it was twelve feet away. Plaintiff says he did not get off the engine because of the presence of cars on a sidetrack east of and next to the main track which made it dangerous for him to do so.

According to plaintiff's evidence the bolt on the side of the coupler on the car was broken and the sill bursted so that the coupler was pushed to one side and would not articulate with the one on the engine.

However, the negligence alleged in the petition, as the basic cause of the injury, was not the maintenance of a defective coupler, that is, a coupler defective in itself, but the negligence of the engineer in failing to observe that the couplers would not meet and in failing to observe and obey the plaintiff's signal to stop although there was time enough for him to have stopped the engine had he been observant and in the exercise of ordinary care. While the petition refers to the "condition of the couplers" and to the fact that they would not meet unless the engine was stopped and the couplers properly adjusted, yet no allegation is made that the couplers, or either of them, were inherently defective. The fact that they would not meet might perhaps have shown that they were defective but for the peculiar language of the petition which seems to place the cause of their failure to meet upon the fact that the roadbed was not ballasted, the rails were not level and the rail joint were uneven and would sink when the engine passed over them, giving to the engine a rolling motion, thus allowing the couplers to pass each other. Hence, the cause of action stated in the petition does not seem to be one based upon a violation of the Safety Appliance Act. If it were, then, since clearly the car was used "on a railroad engaged in interstate commerce" as provided in the amendment of March 2, 1903, to the Safety Appliance Act, it would not matter whether plaintiff was or was not engaged in interstate commerce at the very moment of his injury. [Roberts on Injuries to Interstate Employees, sec. 50, p. 119.] Taken as a whole, and fairly construed, the petition shows that the cause of action really stated is, under the Federal Employer's Liability Act, and is based solely upon the engineer's negligence in the operation of his engine, with the fact of the coupler being over to one side alleged merely as a circumstance suddenly calling for the stopping of the engine and the consequent exercise of care on the part

of the engineer. And this was the question submitted in the instructions. Nothing was said therein about the defendant being liable on account of the coupler failing to couple automatically. And the evidence of plaintiff as to the bolts on the side of the coupler being broken was not testified to as a ground of liability but only in explanation of why the coupler was on one side. The petition clearly alleged that they would not meet and it was not error, therefore, for plaintiff to give all the reasons why they would not, including the fact that it was broken, even if the petition did not state a violation of the Safety Appliance Act because no allegation was made of any defect inherent in the coupler itself.

Upon the question whether there was sufficient evidence of the engineer's negligence to take the case to the jury, we think there was and that there was not a failure of proof as claimed by defendant. The plaintiff did undoubtedly kick the coupler when he finally realized that the engineer was not going to obey the signal to stop. The engineer admits he got a signal but says it was not until the engine was within two feet of the car and therefore too late for him to stop. There is substantial evidence that the signal was given when the engine was far enough away to have enabled the engineer to stop had he been observing the signals; also that the couplers would not have met had not plaintiff kicked one of them and that even then they did not fully meet but only partially so and failed to couple.

We cannot agree with defendant that the plaintiff is conclusively shown to have been so guilty of contributory negligence as to bar his recovery as a matter of law. Neither assumption of risk nor contributory negligence were raised as a defense, the answer being a general denial, but upon the theory that plaintiff's own evidence discloses these matters it may be that defend-

192MA5

ant can make use of them, if found available, regardless of the failure of the answer to raise them. However, under the third section of the Federal act contributory negligence is no longer a complete defense but operates to reduce the damages. Said act also provides that neither contributory negligence nor assumption of risk shall be available where the injury was caused or contributed to by the violation by the carrier of any Federal statute enacted for the safety of employees. It is not necessary to pass on the question whether the failure to plead a defective coupler in this case forbids the operation of these provisions notwithstanding the evidence shows the coupler was defective, because in plaintiff's instructions he did not seek the benefit thereof, but submitted the question of plaintiff's contributory negligence to the jury directing them that if they found plaintiff guilty of contributory negligence, then such was not bar to a recovery, but would reduce the damage, if any, "in proportion to the ratio his negligence bears to the combined negligence of plaintiff and defendant, if any." As plaintiff's injury arose from his kicking the coupler in an emergency rather than in taking some other precaution for his safety, it would seem that his act should be classed as contributory negligence rather than as assumption of risk, if either, since the former term "involves the nature of some fault or breach of duty on the part of the employee" or is "the failure to use such care for his safety as ordinarily prudent employees in similar circumstances would use," while assumption of risk "may be free from any suggestion of fault or negligence on the part of the employee." [Seaboard Air Line Railway v. Horton, 233 U. S. 492, l. c. 503-4.] The Supreme Court of the United States here says that this is the distinction between contributory negligence and assumption of risk and that congress evidently recognized that distinction in the wording of the act. It is only when the injury is due solely to the

negligence of the employee that such fault on his part will preclude a recovery. [Grand Trunk, etc., R. Co. v. Lindsay, 233 U. S. 42; Pankey v. Atchison, etc., R. Co., 180 Mo. App. 185.] Clearly it cannot be said that plaintiff's act in kicking the coupler was the sole cause of the injury. The necessity for the kick arose through the failure of the engineer to stop after receiving a signal to do so when there was yet time for that to be done.

It is urged that the petition did not sufficiently allege that the parties were engaged in interstate commerce, but this contention is without merit.

So also is the point that the court erred in admitting the records of the Missouri Pacific kept at Martin City to show that the empty car in question was not stopped there when it started west from Dodson on July 9th. This was to show that the car did not stop in Missouri, but continued on its return in the interstate circuit it was making. The records admitted were shown to be correct by the testimony of the agent who kept them and it also was shown that they were made in the due course of business. The fact that the Missouri Pacific Agent at Dodson was on the stand at the time the record was introduced made no difference. He was not identifying the records but was merely explaining them. Their identity and correctness had been properly attested by the Martin City agent the day before.

The judgment is affirmed. All concur.