ANNA CAMP, as Administratrix, etc., of WILLIS CAMP, Deceased, Respondent, Appellant, *v.* PENNSYLVANIA RAILROAD COMPANY, Appellant, Respondent.

Third Department, March 17, 1922.*

Railroads — Federal Safety Appliance Act — action under Federal Employers' Liability Act for death of conductor of yard crew — accident happened while crew were readjusting cars on private siding and removing empties to storage track — said cars when placed on siding contained interstate freight — decedent not engaged in interstate commerce.

The conductor of a yard crew, who received injury through the use of defective automatic couplers in alleged violation of the Federal Safety Appliance Act, was not engaged in interstate commerce so as to render the railroad company liable under the Federal Employers' Liability Act, where it appeared that at the time of the accident the crew was engaged in readjusting the position of a loaded freight car on a private siding and incidentally in removing therefrom two empties which were to be placed on the storage track to await further orders; that the loaded car and the two empties contained interstate freight when they were delivered on the siding two days before the accident, and that there was no evidence that the empty cars were under orders, at the time of the accident, to be returned to the point of shipment in a foreign State or that the crew were about to place them in a train for that purpose or that the work had any reference to their homeward journey.

HINMAN, J., dissents, with opinion.

ON REARGUMENT.

Verdict — general verdict inconsistent with special verdict — new trial granted on reargument although grounds of decision on former argument rendered untenable by decision of Court of Appeals.

Although the grounds of the decision of the Appellate Division made on the former argument in this case are rendered untenable by the decision of the Court of Appeals in *Ward* v. *Erie R. R. Co.* (230 N. Y. 230), the inconsistency of the general verdict with the special verdict justifies the reversal of a judgment in favor of the plaintiff and the granting of a new trial.

HINMAN, J., dissents.

APPEAL by the defendant, Pennsylvania Railroad Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Chemung on the 17th day of August, 1921, upon the verdict of a jury for $5,000, and also from an order entered in said clerk's office on the same day denying the defendant's motion to set aside the verdict and for a new trial made upon the minutes.

Appeal by the plaintiff, Anna Camp, from an order, entered in said clerk's office on the 17th day of August, 1921, denying

* Withheld from publication by direction of the court, pending the decision of a reargument of the appeal. See *post,* p. 87.— [REP.

plaintiff's motion to correct and amend the answer of the jury to one of the specific questions submitted to them.

*Mortimer L. Sullivan,* for the plaintiff.

*Alexander S. Diven,* for the defendant.

COCHRANE, P. J.:

To sustain this judgment it must appear that the deceased at the time of his injury was engaged in interstate commerce. On April 27, 1917, three cars loaded with coal reached Canandaigua, N. Y., from Pennsylvania. The coal was consigned to the A. N. Hollis Coal Company of the former place, which company has a private siding or switch connected with the defendant's road. The loaded cars were placed on this siding to be unloaded by the consignee. April twenty-ninth two of the cars had been unloaded. The third car was in such a position on the siding that it could not be conveniently unloaded. This loaded car was between the two which had been unloaded. The yard crew of which the deceased was conductor entered the siding with an engine for the purpose of readjusting the position of the loaded car. Incidental to that duty and according to custom it was the purpose of the crew to remove the empty cars from the siding and return them to the yard. While coupling the engine to the cars the deceased received his injury, due, as it is claimed, to defective automatic couplers, in violation of the provisions of the Federal Safety Appliance Act. (See 27 U. S. Stat. at Large, 531, § 2.) It was stipulated by the defendant that after delivery of coal " it was the general practice and custom of the railroad to return them [the empty cars] as soon as practicable to the mines." There is no evidence, however, that these two empty cars were under orders to be returned or that the crew was about to place them in a train for that purpose or that the work had any reference to their homeward journey. On the contrary, the only proper inference is that they were to be placed on the storage track or in some convenient place awaiting further orders. As stated, one of the three cars had not yet been unloaded, and, as a matter of fact, after the accident the two empty cars were left on the siding. In fact the stipulation is " that following the unloading of these cars they were returned to the yard in Canandaigua."

Under the foregoing circumstances it seems clear that the work had reference merely to the readjustment of the position of the several cars on the siding of the consignee or in the yard of the defendant for their convenience and did not involve any interstate movement of the cars. If it be assumed that the primary purpose of the crew was to remove the empty cars from the siding, the

conclusion reached must be the same because the purpose of such removal was merely to return the cars to the yard of the defendant until they should be ordered elsewhere. In *Pennsylvania Co.* v. *Donat* (239 U. S. 50), cited by plaintiff, the accident occurred while the cars were being placed on the private switch track of the consignee. But they were just completing their journey and their delivery on the private track of the consignee was a part of the interstate movement which was not completed until delivery was made. Here, as we have seen, delivery was complete two days before the accident and two of the cars in the meantime had been unloaded. The burden of proof was on the plaintiff to establish that the deceased at the time of the accident was engaged in interstate commerce and this burden she has failed to meet.

The judgment and order denying the motion for a new trial should be reversed and the complaint dismissed, with costs.

The order denying plaintiff's motion to correct the answer of the jury is affirmed, without costs.

As to judgment and order, all concur, except Hinman, J., dissenting, with an opinion; Kiley, J., not sitting.

Order denying plaintiff's motion to correct answer of the jury unanimously affirmed, without costs; Kiley, J., not sitting.

Hinman, J. (dissenting):

The plaintiff has had judgment for damages in an action brought under the Federal Employers' Liability Act (35 U. S. Stat. at Large, 65, chap. 149, as amd. by 36 id. 291, chap. 143) for the death of plaintiff's intestate, brought about by his injury while acting as an employee of the defendant as the result of the negligence of the defendant.

It was stipulated on the trial that three cars of coal were shipped over the defendant's line from Pennsylvania to Canandaigua, N. Y., for delivery to the A. N. Hollis Coal Company of the latter place; that they were placed upon the Hollis siding (a private switch) on April 27, 1917; that two of the cars were unloaded on that and the following day; that it was the usual and general practice to return empty coal cars as soon as practicable to the mines in Pennsylvania. The car which had not been unloaded had been placed with the others by the railroad at a point where Hollis could unload it by moving it by hand or gravity down a grade to his elevator. It had been carried past the elevator with the other cars to a point where it could not be moved back by hand. It was on these cars, located on the Hollis siding, that Willis Camp, the plaintiff's intestate, was working at the time he sustained his injuries, resulting in his death.

On Sunday afternoon, April 29, 1917, Camp was in charge of a yard crew of a switch engine consisting of himself, a brakeman and a fireman, who was operating the engine. They were notified by the yardmaster to go to the Hollis siding, but it is not clear whether they were directed to simply do some switching for Hollis in order to replace the loaded car of coal near his elevator for unloading, or whether the instructions included taking out the two empty cars. One of the crew, the brakeman, in one part of his testimony stated that their instructions included taking out the two empty cars. In a later part of his testimony, however, he stated that they went down to do some switching for Hollis; but he added: " We know wherever we find empties to take them out and ship them South. Q. You were going to do that on this occasion? A. Yes. When we started down there we didn't know what he had. He just said he wanted some switching done. When we got down there we found the two empties and load." So it seems from the stipulation and from this uncontradicted testimony that the duty of the crew was to take out the empty cars when they found them there and that they were going to take them out on this occasion.

The Hollis siding runs in a northerly and southerly direction, the switch connection with defendant's line being at the north end. When they entered the switch they found the north car was empty. The elevator at which the middle car had to be unloaded was south of the place where the cars were standing. To remove the two empty cars necessitated coupling the cars together and hauling them out onto the main track in order to get the empty south car past the loaded car. Their purpose was to pull out the empty cars, then place the loaded car in front of the elevator, and then take the two empty cars to the storage track of the company for their trip back to Pennsylvania, thus completing their interstate journey. Camp was caught between the cars in the effort to couple them.

This was sufficient evidence to justify the jury in finding that Camp was engaged in interstate commerce at the time. Even though the loaded car was to be replaced in a position where it could be unloaded at the elevator, the empty cars were being removed to complete their interstate journey. In order to remove the empty cars to the south, it was necessary to remove the loaded car also. It was in this first maneuver to remove the empty cars to the south that the injury occurred. Thus it cannot be said that Camp was not engaged in interstate commerce at the time of his injury. Where an accident happens in New York State

involving the appliances of a coal car which was shipped from Pennsylvania, which clearly was to be returned empty to the mines in the latter State, that car is necessarily stamped with interstate character in every movement required to return it to the mines. In fact these cars did go back to the mines empty. We cannot say that the character of this car was not determined until actually classified as such in a classification yard. (*New York Central R. R.* v. *Carr*, 238 U. S. 260; *Pennsylvania Co.* v. *Donat*, 239 id. 50; *Reap* v. *Hines*, 273 Fed. Rep. 88; *Voelker* v. *Chicago, M. & St. P. Ry. Co.*, 116 id. 867; *Johnson* v. *Southern Pacific Co.*, 196 U. S. 1; *Johnson* v. *Great Northern Ry. Co.*, 178 Fed. Rep. 643; *Trowbridge* v. *Kansas City & W. B. Ry. Co.*, 192 Mo. App. 52; 179 S. W. Rep. 777.)

The theory upon which the case was presented to the jury was a violation by defendant of that provision of the Federal Safety Appliance Act (27 U. S. Stat. at Large, 531, § 2) which makes it unlawful for an interstate carrier " to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact." In construing this provision the courts have held that the statute places upon the railroad an absolute duty to equip its cars with couplers which will at all times and under all normal conditions of railroading, couple automatically upon impact. (*Delk* v. *St. Louis & San Francisco R. R.*, 220 U. S. 580; *Chicago, R. I. & Pac. Ry.* v. *Brown*, 229 id. 317; *Texas & Pacific R. Co.* v. *Rigsby*, 241 id. 33; *Johnson* v. *Southern Pacific Co.*, 196 id. 1; *Davis* v. *Minneapolis & St. L. Ry. Co.*, 134 Minn. 369; 159 N. W. Rep. 802.)

There was testimony offered by the plaintiff which would justify the jury in finding that at least one or two unsuccessful attempts were made to couple the cars by impact, before the plaintiff's intestate went between them. The failure of the couplers to function under the circumstances was sufficient to go to the jury. (*Minneapolis & St. Louis R. R. Co.* v. *Gotschall*, 244 U. S. 66; *Atlantic City R. R. Co.* v. *Parker*, 242 id. 56; *Willett* v. *Ill. Cent. Ry. Co.*, 122 Minn. 513; 142 N. W. Rep. 883; *Hohenleitner* v. *So. Pac. Co.*, 177 Fed. Rep. 796; *Pless* v. *N. Y. C. R. R. Co.*, 189 App. Div. 261.)

It made no difference that the cars were being operated on a private switch as that has been held to be a use on the railroad's " line " within the meaning of section 2 of the Safety Appliance Act. (*Gray* v. *Louisville & N. R. Co.*, 197 Fed. Rep. 874.)

A question of further negligence in the case, involving negligence of the engineer in backing the engine without waiting for a signal from Camp, is presented upon the briefs, but it should not be considered here in support of the verdict since no such theory

seems to have been presented to the jury by the court or by any requested charges. Moreover, there is no evidence in the case as to any duty on the part of Camp to give any signal or on the part of the engineer to act only upon signal.

Another point in the appeal which seems to involve a novel question in this State relates to whether the answer of the jury to a special question is inconsistent with the general verdict, requiring the reversal of the judgment for the plaintiff under section 1188 of the Code of Civil Procedure. The question was as follows: " Question Two. At the time stated in Question One was the defendant, through its servants, moving a car not equipped with couplers, coupling automatically by impact? " The jury answered this question in the negative.

The question submitted to the jury was framed practically in the language of the statute. After the case had been submitted, the jury returned into court and requested further instructions in relation to the meaning of this question.

They asked the court in substance whether it meant the cars were equipped with automatic couplers, or whether they would have coupled on impact if in perfect condition. To this question the court responded: " There isn't any question in the evidence but what the cars were originally equipped with improved couplers, that coupled by impact. The question is, in dispute, whether these couplers at that time were in such condition that they would couple by impact. That is, whether they had become worn or defective or out of order in some way so that they would not operate properly. There is no question, as I have already said, but what the couplers as originally constructed and put on these cars were of a type that would couple by impact. The question is * * * at the time of the accident, were they in condition so that the impact of the cars together would cause them to couple automatically or were they in some defective condition so that a man had to go in there to do something with his hands in order to get them to couple. * * * You must determine from the evidence whether the cars moved together and they did not couple, whether they were defective or whether that was caused by its being on a curve or because they were on a down grade or some other reason. The question that you must determine and the question that seems to be in your mind, is whether these couplers were, at the time, in such condition that they did not couple automatically."

The jury retired and finally brought in a general verdict for the plaintiff but answered question No. 2 in the negative.

" Where a special finding is inconsistent with a general verdict, the former controls the latter, and the court must render judgment

accordingly." (Code Civ. Proc. § 1188.) He who urges the
application of the rule must bring his case fairly within it. The
burden is upon him to show an inconsistency which excludes every
hypothesis of consistency upon any fair interpretation of the question
and answer involved. It is not sufficient that it may be inconsistent.
(Clements on Special Verdicts, p. 131; *McCoy* v. *Kokomo Ry. &
Light Co.*, 158 Ind. 662; 64 N. E. Rep. 92; *Larkin* v. *Upton*, 144
U. S. 19; *Krumdick* v. *Chicago & N. W. Ry. Co.*, 90 Minn. 260;
95 N. W. Rep. 1122; *Missouri Pac. Ry. Co.* v. *Holley*, 30 Kan. 465;
1 Pac. Rep. 130; *Bevens* v. *Smith*, 42 Kan. 250; 21 Pac. Rep. 1064.)

According to a fair interpretation of the question as framed,
the idea conveyed was whether the car was equipped with that
type of coupler which couples automatically by impact, whereas
the courts have held, as we have seen, that the requirement of
the statute places upon the railroad an absolute duty to equip
its cars with couplers which will at all times and under all normal
conditions of railroading couple automatically upon impact.

In reading the bare question, framed as it was in the language of
the statute, a jury would not have the benefit of the illumination
of the statutory expression in question, gleaned from careful study
of the intent and purpose of the statute as a whole. The provision of
the statute in question here was designed to promote the safety of
employees upon railroads. The railroad did not satisfy this funda-
mental purpose by merely equipping a car with an approved type
of coupler. It must keep it in such condition that it would accom-
plish the purpose. This refinement came from a close judicial study
of the statutory environment of the coupler provision and was not
indicated by the provision itself unaided by the context.

Taking the situation presented to this jury, should we expect
an answer to the naked question as framed or should we expect
an answer to the question as interpreted by the courts? If we
are in doubt, how can we say which question the jury answered?
The answer " no " was susceptible of an interpretation in harmony
with the general verdict and it was equally susceptible of an
interpretation inconsistent with the general verdict. The jury
were asked to find upon a question of fact, not a question of law,
and when the question was put in the language of the statute,
it did not necessarily ask whether the statute had been violated.
As interpreted by the courts, the statute could be violated in
two ways — by not using a so-called automatic coupler at all
and by not keeping one in proper condition. The question did
not indicate any reference to the condition of this coupler. How
then can we say that the jury has passed upon that particular
violation rather than the other?

It is said that we must do so because that was the interpretation placed upon it by the trial justice when the jury returned into court and asked for further instructions. The test of the propriety of thus utilizing the interpreting remarks of the learned justice is to determine whether any such impression was left in the mind of the jury as would require it or this court to say that the question answered meant that and nothing else. The court did not change the form of the written question but orally restated the question at the beginning of his remarks as follows: " The question is, in dispute, whether these couplers at that time were in such condition that they would couple by impact." And the court concluded his remarks by putting the question as follows: " The question that you must determine, and the question that seems to be in your mind, is whether these couplers were at the time in such condition that they did not couple automatically."

It is perfectly apparent that an answer to either of these two oral questions should be in the negative in order to be in harmony with the general verdict. The jury's answer was in the negative. I think it is fair to say that the jury intended to answer the question as orally restated. At least we would have to admit grave doubt. If we were in doubt as to whether the impression carried away by the jury was to answer the written question as interpreted or the question as orally restated by the court, how could we say that the jury's answer referred to the one and not to the other? Having gone outside the ambiguous question itself to find the intent of the jury, it would be useless to try to predicate a finding of such intent upon something equally ambiguous and doubtful. With " confusion worse confounded " we could only turn again to the question as written, and unaided by interpretation we could not say that the answer to it was so inconsistent with the general verdict that the latter could not stand.

Under these circumstances I think the general verdict should stand and that the special finding should be disregarded because not necessarily in conflict with the general verdict.

There is one further contention raised against the judgment. The defendant contends that the evidence was insufficient to establish a legal marriage between the plaintiff and plaintiff's intestate, so as to entitle her to the benefits of a recovery under the Federal Employers' Liability Act.

Considering the evidence from the standpoint most favorable to the plaintiff, the jury were justified in finding that a valid common-law marriage had existed between her and Willis Camp for many years and still existed at the time of his death. The difficulty arises over the fact that she had been married to one Edward

Lowry on July 15, 1902, which marriage has never been dissolved and at the time of the trial Lowry was still alive and was a witness. Lowry had deserted her a few days after the marriage. She followed him and endeavored to locate him, made inquiries of his sister and of railroad men. Lowry had been a railroad man. She consulted a lawyer to investigate for her. He was unable to find any trace of Lowry but reported to her that he had found there was a woman in Corning claiming to be Lowry's wife. In the fall of 1902 she became ill. She subsequently learned that he had returned during her illness and had taken away some of his personal effects but she did not see him. Upon that visit Lowry promised to provide for her but he never did and she never heard from him and never saw him again until after the death of Camp. He appeared after the death of Camp and testified at the trial. The evidence tends to show that Lowry was a hard drinker, was wild and absented himself for years at a time without communicating with even his family. His sister testified that oftentimes she would wonder whether he was dead. During the period of his absence, according to his testimony, he was in Canada, in Michigan, New York State and Pennsylvania. The plaintiff testified that she had heard that he was dead. It was after this and on March 20, 1907, that she married Willis Camp at Williamsport, Penn. Thereafter and continuously to the death of said Willis Camp on the 29th day of April, 1917, she lived with him in the State of New York as his wife and was so held out by him. He supported and maintained her. He brought his money home to her and she used it in the home. He also obtained a pass for her on the railroad and the same was issued to her as Camp's wife.

The ceremonial marriage between the plaintiff and Camp was void, for the reason that less than five years had elapsed between the time of the disappearance of Lowry and her marriage with Camp. Although this marriage was void, the jury were justified in finding that there existed between the plaintiff and Camp a valid common-law marriage, as she and Camp had lived together from the time of their marriage in 1907 up to the time of Camp's death in 1917 as husband and wife under circumstances whereby such a marriage could be found to have existed. (*Davidson* v. *Ream*, 178 App. Div. 362; *Matter of Ziegler* v. *Cassidy's Sons*, 220 N. Y. 98; *Matter of Biersack*, 96 Misc. Rep. 161; *Fordham* v. *Gouverneur Village*, 5 App. Div. 565; *Matter of McKinley*, 66 Misc. Rep. 126.)

Such a marriage was not void but simply voidable. It is valid as to all the world, unless the first husband reappears and institutes an action to annul the same. (*Gall* v. *Gall*, 114 N. Y. 109; *Matter of Del Genovese*, 56 Misc. Rep. 418; Dom. Rel. Law, § 7; Code Civ.

Proc. § 1745.)   The first marriage to Lowry was simply suspended. It was not reinstated by the return of the absentee.   It ceases to be binding until one of the three parties to the two marriages procures a decree pronouncing the second marriage void.   This was not done during the lifetime of Camp, the second husband, and, therefore, plaintiff's right to recovery here cannot be questioned by the defendant in view of the sufficiency of the evidence to support the finding of the jury that a valid common-law marriage existed between the plaintiff and Camp.

The judgment and order denying the motion for a new trial should be affirmed, with costs.   The order denying plaintiff's motion to correct the answer of the jury should be affirmed, without costs.

Judgment and order denying motion for a new trial reversed and complaint dismissed, with costs.

Order denying plaintiff's motion to correct answer of the jury unanimously affirmed, without costs.

Upon a reargument of the appeal from the judgment and order denying a motion for a new trial, directed on May 10, 1922 (202 App. Div. 768), the following memorandum was handed down on May 24, 1922:

PER CURIAM:

In view of the decision in *Ward* v. *Erie R. R. Co.* (230 N. Y. 230) we consider that the grounds of our former decision herein (201 App. Div. 78) are not now tenable.   We think, however, that the inconsistency of the general verdict with the special verdict found requires a reversal and a new trial.

Judgment and order reversed and a new trial granted, with costs to the appellant to abide the event.

All concur, except HINMAN, J., dissenting on the ground stated in his opinion on the former argument.