**GERAGHTY v. LEHIGH VALLEY R. CO.**

District Court, E. D. New York.

May 8, 1933.

Thomas J. O'Neill, of New York City (William J. Hogan, of New York City, of counsel), for plaintiff.

Alexander & Green, of New York City (H. S. Ogden, of New York City, of counsel), for defendant.

BYERS, District Judge.

This is a motion to set aside a plaintiff's verdict, decision having been reserved at the close of the trial on April 10, 1933.

The plaintiff's intestate lost his life on February 3, 1932, while in the employ of the defendant company (as he had been for eighteen years) as freight conductor; he was engaged in the handling of cars on railroad tracks at the plant of the American Smelting and Refining Company at Maurer, near Perth Amboy, N. J.

The status of those tracks is an essential element of the case.

The car movement involved was the withdrawal of two empty railroad freight cars from the converter house of the Smelting Company; they were at the stub end of the track within the house, and to them was attached flat car #115 of the Smelting Compa-

ny; outside the building, and on the converter track, were four or five Smelting Company flat cars, the end one being #117—that is, nearest the converter house.

These latter were moved toward the three first named by the defendant's locomotive, operated by its crew, and in accordance with signals given by Geraghty, the decedent, who stood alongside the track, at the opening between these two strings of cars, and, when coupling had been accomplished, the combined train was to have moved outward from the converter house, and three loaded railroad freight cars would be moved into the converter house to be unloaded.

These three, and the two "empties" which have been mentioned had arrived together in the Smelting Company yards, from interstate points, on the previous day.

The handling of those five cars has presented the interesting and perplexing question involved in this case, because Geraghty stepped in between Smelting Company cars #117 and #115 as they were about to come together, and was so crushed that two days later he died. The Smelting Company cars were plant equipment and never left the yard.

The plaintiff contends that the withdrawal of the two empty freight cars, even though they were attached to Smelting Company cars, was connected with interstate commerce, and therefore the Safety Appliance Act (45 USCA § 1 et seq.) applied, and that the evidence shows that the couplings on the Smelting Company cars were so faulty that the Act was violated, and the verdict of the jury should be sustained.

The defendant contends that the tracks in question did not constitute a portion of an interstate highway, and consequently this court has no jurisdiction of the case; that the Smelting Company cars were not subject to the Safety Appliance Act; and that the evidence does not demonstrate that the decedent came to his death because of any fault in the couplings.

The defendant offered no proof, and consequently the plaintiff's evidence only is available for the purposes of this motion.

It will be convenient to consider primarily the legal status of the tracks in the Smelting Company plant.

The plaintiff called the yard master of the Smelting Company, who has been so employed for eighteen years, and is therefore thoroughly familiar with the tracks in the yard. He identified as accurate a blue-print of the Smelting Company yard, showing the

various tracks, switches, signals and other railway appurtenances, which was produced by the defendant under subpœna duces tecum.

Pursuant to that identification, the blueprint was received in evidence, over defendant's objection, with a reservation to it, however, to strike the exhibit from the record if the print could be shown to be lacking in accuracy or authenticity.

The defendant did not avail itself of this privilege, nor did its cross-examination tend to establish that Sprague (the yard master) was mistaken in stating that there are about 30 miles of tracks in this yard, and that about 29 of them are Lehigh Valley tracks, the ties and rails of which are maintained in condition by the defendant company.

The survey was not offered to prove anything concerning the legal title to the real estate upon which the rails were laid, and the record makes this clear.

The maintenance of the rails and ties, by the railroad company, upon the lines shown on the blue-print, was a fact within the competence of Sprague to observe for a period of eighteen years; and the operations, hereinafter described, by the defendant, on those tracks, taken together, constitute practical evidence of proprietorship over the rails, ties, switches and railroad equipment, which must be deemed presently sufficient.

The defendant urges that, even though ownership of the tracks involved be deemed established, they do not constitute a highway of interstate commerce; that the enclosure of the Smelting Company's plant by a fence, which contains a gate opened from within to permit entrance and exit of interstate railroad cars hauled by one of defendant's locomotives, establishes the contrary.

It is thought that the physical characteristics of the yard and tracks do not determine the question, but rather the use to which they are put. Thus, if the yard were unfenced, it might still be a place where only intrastate traffic moved, while a brick wall might not constitute a barrier to interstate commerce.

The testimony shows that the five cars in question were the subject of separate order bills of lading issued at places outside of New Jersey, to named consignees, destination Perth Amboy, N. J., "notify American Smelting & Refining Company."

It must be inferred that notification was given, because the bills of lading were surrendered.

Sprague said that he was unfamiliar with the "procedure taken" with such documents,

concerning the place of surrender and whether the cars were retained in the railroad yard until that act had been performed; he did know that the cars were held in the Perth Amboy yard of the defendant, about a mile from the Smelting Company plant, until the release was given or ordered from the office of the latter.

Thus far it may be said that the evidence is insufficient to indicate the survival of any duty on the part of the defendant, beyond the placing of these cars in the Perth Amboy yard of the defendant company.

However, Sprague went on to relate that this defendant hauled the cars into the Smelting Company yard, through the gate and on the tracks referred to, i. e., the Lehigh Valley tracks; that the cars were weighed inside, the yard, full and later empty, and that a record was made of the contents and weight thus established; that, within the yard, such cars were moved by defendant's engine and crew, and distribution to the various parts of the yard was ordered by Sprague, who told the conductor how many cars were to be taken to a given point and so on, but the details of execution were left to the conductor. That he (Sprague) acted as time-keeper for all such operations, and particularly on February 3, 1932, between 12:45 and 2:15 p. m., the defendant's engine and crew shifted cars in this yard, and, of the time so involved, but twenty minutes were credited to the railroad company as time for which it was to be paid, because devoted to shifting Smelting Company cars only, employed in connection with an excavation under way in the yard.

The service therefore of shifting *railroad* cars in the Smelting Company yard was either gratuitous, or it was paid for.

If it was gratuitous, it was in the nature of a rebate, and hence illegal. Nothing of the kind can be presumed; therefore it must have been paid for, and, in the absence of evidence to the contrary, the only permissible inference is that such service was regarded by the carrier and the Smelting Company as an incident of the duty of completing delivery. If this is so, the obligations of the interstate carrier were not fulfilled until something had been done with these five cars, after they had been hauled into the yard of the Smelting Company, which is another way of saying that the defendant's tracks within that yard were used by it as an extension of the highway of interstate commerce exterior to the yard.

To this reasoning, the defendant interposes the following:

· Camp v. Pennsylvania Railroad Co., 201 App. Div. 78, 193 N. Y. S. 31, 195 N. Y. S. 90: The authority of this case is so impaired by the court's own declaration upon reargument, that, in view of Ward v. Erie R. R. Co., 230 N. Y. 230, 129· N. E. 886, the grounds of decision are untenable, that the case may be passed over.

Delaware, L. & W. R. Co. v. Peck (C. C. ·A.) ·255 F. 261: The plaintiff had a judgment which was reversed by the Second Circuit Court of Appeals because the injury was held to have been suffered after interstate commerce had ended; a coal car consigned to Hart at Delawanna, N. J., arrived on September 16, 1916, and, at Hart's direction, was placed on the old siding; two days later Hart directed that it be moved to Hart's siding.· Both movements were within the yard limits of Delawanna. The coal was receipted for on the day of arrival, and demurrage began from 7:00 a. m. on the second day following. The court says that the interstate journey had ended when the car was first placed as directed by Hart.

· In that case the court had the benefit of the defendant's evidence as to the direction for placing the car. That is the element missing here. There is nothing now presented which characterizes the delivery of these five cars into the Smelting Company yards and the subsequent movement of them therein, as being outside of the contract of carriage. Moreover, in order that the case should be controlling, it would have to appear that this accident happened in the Perth Amboy yard of the defendant, and that the Smelting Company had directed the movement of the five cars from one track to another in that yard, after having selected the track upon which they should be placed initially.

Schauffele v. Director General of. Railroads (C. C. A.) 276 F. 115: The Third Circuit Court of Appeals affirmed a judgment entered upon a directed verdict for defendant, involving an accident in the yards of the defendant, where two unloaded and one loaded car were moved. Arrival had occurred ten days earlier, and the unloaded cars were being shifted to a place for repair, and the loaded car to a chute for unloading. All had come from outside the state, carrying coal in interstate commerce.

There was no evidence at the trial of "the character of commerce, if any, in which the cars were engaged at the time of the accident."

Here there is evidence, which is presently under scrutiny. ·

Lehigh Valley Railroad Co. v. Barlow, 244 U. S. 183, 37 S. Ct. 515, 61 L. Ed. 1070: Defendant's three coal cars had been in its yard for 24 days as to one, and 17 days as to the other two, remaining on sidings and switches until removed to an unloading trestle. It was decided that interstate movement terminated before the cars left the sidings.

It does not follow that the five cars now under consideration terminated their interstate movement in the Perth Amboy yard of this defendant, under the circumstances here existing.

Chicago, Burlington & Quincy R. Co. v. Harrington, 241 U. S. 177, 36 S. Ct. 517, 60 L. Ed. 941: The decedent was a member of a switching crew that shifted cars of the defendant company from storage tracks to bins, from which the contents of the cars (coal) were placed in defendant's locomotives. The coal had been in storage for a.week or more before the operation in question.

The case is referred to because the defendant apparently relies upon it, not because it presents facts remotely resembling those under consideration.

A consideration of the foregoing cases yields the conclusion that nothing has been said or decided which inevitably determines that the Lehigh Valley Railroad tracks in the yards of the Smelting Company cannot be regarded as a branch of the defendant's highway of interstate commerce.

There are also in the plaintiff's case way bills issued with respect to four of these five cars, describing the routing, and having on their faces the words Perth Amboy and Maurer, the latter over the former. As the defendant had no freight yard designated by the latter name, it is a reasonable inference that Maurer was the destination of the cars to which the way bills applied, and that these particular Lehigh Valley tracks in Maurer constituted the destination of those cars.

Sight has not been lost of the stamp impressed by the defendant on the face of the five bills of lading, reading "Delivery accomplished Feb. 1, 1932." This stamp, of course, was not binding on the plaintiff, as it was obviously added to these documents after surrender, and, standing by itself, is at variance with the delivery of the five cars inside the Smelting Company plant, by the defendant, on the following day, February 2, 1932.

For the purposes of this· decision, that stamp must be disregarded as a·factor in the legal relation between Geraghty and the defendant on February 3, 1932.

If the foregoing is sound, the evidence thus far is compatible with the conduct of interstate commerce by the defendant, in moving the five cars in question within the Smelting Company's yard.

As to whether taking those cars loaded into the converter house, and moving them out empty, was so closely related to interstate transportation as to constitute a part of it, naturally turns upon the question of when and where the duty of the defendant ended with reference to those cars.

That was left to the jury, for the reason that the evidence showed that nothing was paid to the defendant for rendering such service. Had the defendant offered testimony to establish that the engine and crew were paid according to the time sheets kept by Sprague, for moving these cars to and from the converter house, between the weighing in and weighing out, and had that evidence not been controverted, there would have been no escape from the conclusion that the interstate movement came to an end before the cars were hauled for unloading; however, the record is silent on that point, and nothing has been cited in the defendant's brief on this motion, to show that there was no evidence to submit to the jury on this aspect of the case.

The evidence points to° the establishment of the tonnage involved, and therefore the freight payment, by the described process of weighing; that this is directly connected with interstate commerce was decided in St. Louis, San Francisco & Texas R. Co. v. Seale, 229 U. S. 156, 33 S. Ct. 651, 57 L. Ed. 1129, Ann. Cas. 1914C, 156, also in Wheeling Terminal Ry. Co. v. Russell (C. C. A.) 209 F. 795.

Thus far, therefore, nothing has been shown to require setting aside the verdict.

The court is next asked so to intervene because there was no evidence of a violation of the Safety Appliance Act (45 USCA § 1 et seq.).

The report (subpœnaed by plaintiff) on the condition of the couplers of the Smelting Company cars between which Geraghty was injured, made on the day following the accident by the defendant's foreman of car repairs, shows that certain of the coupling parts were worn, and permitted the cars to come closer together than would have been possible if they had been in good order. True, this witness said that he had nothing to do with the maintenance and upkeep of these cars, and had not ordered repairs; but the cars were used on the line of the defendant, and hence were within the statute. The testimony is that these couplers contained no centering device, and it was open to the jury to conclude that the knuckles were not centered within Geraghty's observation, or so experienced a man as he would not have stepped in to render the coupling possible on contact between the cars.

The issue was not whether the coupling was effected on impact, because there was no dispute as to that, but whether it was necessary for the decedent to reach or go in between the cars and do something to the couplers to enable them to function as the law required that they should.

Two cases relied upon by the defendant are McCalmont et al. v. Pennsylvania R. Co. (C. C. A.) 283 F. 736, and Weekly v. Baltimore & Ohio R. Co. (C. C. A.) 4 F.(2d) 312. In the first, the court examined the testimony and concluded that it was the failure of the decedent to plant his flag as required by the rules, and not the defect in the coupling device, that caused the injury. In the second, the same court found that the evidence did not justify the inference that the decedent stepped between the cars to open a closed coupler by reason of the failure of the lever to function, because the latter was on the side of the car opposite to the decedent's position before the happening; that to permit recovery in that case would have been to base one inference on another.

In this case, the faulty condition of the couplers, drawbar, beams and carrying irons was shown by the defendant's report of inspection on the day following the accident. The only inference involved was that Geraghty stepped between the cars in order to render possible coupling on contact, by bringing the knuckles into alignment, because otherwise that result would not have followed.

If that inference was not open to the jury under such circumstances as are here shown, it is difficult to see how the manifest purpose of the statute can be accomplished in a death case unless a witness can be called who was so close at hand as to have an unobstructed view of everything observable by the one whose voice could not be heard at the trial. It is thought that this law makes no such requirement.

For these reasons, the verdict will not be disturbed; no argument has been made that it is excessive, involving as it did the element of conscious pain and suffering.

Motion denied. Settle order.