PENNSYLVANIA R. CO. v. KNOX.

(Circuit Court of Appeals, Third Circuit. January 4, 1915.)

No. 1880.

1. COMMERCE (§ 27*)—EMPLOYER'S LIABILITY—"INTERSTATE COMMERCE"—"AT HOME"—"DRIFTING."

Empty railroad cars were delivered in New York to the railroad to which they belonged, and were then, being in the hands of the owner, according to railroad regulations and practice, "at home." They were moved, without being billed or destined for any particular place, to points in Pennsylvania, where such cars were usually assembled for distribution and use, and, not being needed at such points, were from time to time moved to other distributing points in that state. They were still "drifting," or waiting to be assigned for service, when an injury to a brakeman on a train on which they were being moved occurred. *Held,* that the interstate movement of such cars ceased when they reached the first distributing point in Pennsylvania, and thereafter their movement did not constitute "interstate commerce," within the federal Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65, as amended by Act April 5, 1910, c. 143, 36 Stat. 291 [Comp. St. 1913, §§ 8657–8665]).

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. § 27.*

For other definitions, see Words and Phrases, Second Series, At Home; also First and Second Series, Interstate Commerce.]

2. COMMERCE (§ 27*)—EMPLOYER'S LIABILITY—STATUTORY PROVISIONS.

The movement of empty railroad cars is an operation of commerce, and where the movement is interstate the Employers' Liability Act applies.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. § 27.*

Employés engaged in interstate commerce within Employers' Liability Act, see note to Baltimore & O. R. Co. v. Darr, 124 C. C. A. 571.]

**8. MASTER AND SERVANT (§ 278\*)—ACTIONS FOR DEATH—SUFFICIENCY OF EVIDENCE.**

In an action for the death of a railway brakeman, due to the breaking of a brake rod, in which it was sought to predicate negligence on the failure to inspect, evidence *held* insufficient to support a verdict for plaintiff, in that it failed to show how long a defect in the rod had existed, whether it could have been discovered by inspection, and whether any inspection, and, if so, what inspection, was made.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. § 278.\*]

In Error to the District Court of the United States for the Western District of Pennsylvania; James Young, Judge.

Action by William C. Knox, administrator of James C. Campbell, against the Pennsylvania Railroad Company. Judgment for plaintiff, and defendant brings error. Reversed, and new venire awarded.

James R. Miller, of Pittsburgh, Pa., for plaintiff in error.
H. Fred Mercer, of Pittsburgh, Pa., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

J. B. McPHERSON, Circuit Judge. This suit (which was tried before the late Judge Young and a jury) was brought by the administrator of James C. Campbell, a freight brakeman in the employ of the Pennsylvania Railroad Company, who was killed in the discharge of his duty on October 1, 1910. His death was the result of injuries caused by the twisting off of a brake rod, and (although several acts of negligence are charged in the statement of claim) the only negligence that was insisted on at the trial and in this court is the company's failure to inspect and repair. The action is brought under the Carriers' Liability Act of 1908 as amended in 1910, and the plaintiff was therefore obliged to sustain the affirmative of these two propositions:

(1) That the injury causing death occurred while the deceased was employed in interstate commerce; and

(2) That the company was negligent in the particular charged.

The facts are as follows:

[1] Campbell lived at Derry, Pa., 46 miles east of Pittsburgh, on the main line of the railroad. Part of his usual duty was to assist in the transportation of coke from the coke regions of Westmoreland county to Coleman Yard, on the Allegheny division of the railroad, a point in Pennsylvania 7 miles east of Pittsburgh. At Coleman the coke was taken charge of by another engine and crew and was carried forward in the direction of its ultimate destination, which was ordinarily a point in New York. After the coke was delivered at Coleman, it became Campbell's duty to perform whatever services might be required of him during the remainder of the day. On the morning of October 1st he and the other members of his crew, with an engine and caboose, went first to Pitcairn Yard, 15 miles east of Pittsburgh on the main line, proceeded thence to the Alexandria branch of the railroad, and took charge there of a train of loaded coke

---

cars that was destined to New York, and moved it to Coleman. At this point Campbell and his crew detached their engine and caboose, and turned to other duties. These duties took them east 5 miles along the Allegheny Valley division to Verona Yard, where they attached their engine and caboose to about 25 loaded and empty cars—some of them box, and some of them open, cars—and hauled them to Pitcairn, arriving about 11 o'clock in the evening. Campbell received his injury while they were backing these cars upon a yard track, where they were to be left for the night.

If there was nothing else in the case, the contention could hardly be made that interstate commerce was being carried on while cars whose starting point and destination were unknown were being shifted from Verona to Pitcairn, two points in the same state; and the plaintiff, recognizing this difficulty, attempted to meet it by offering further evidence. Testimony was offered to this effect: Among the cars in question were 8 that had been unloaded in New York several days before, and had been delivered in that state to the Pennsylvania system, to which they all belonged. According to railroad regulations and practice these cars were all "at home"—that is, in the hands of the owner—as soon as they were delivered and accepted at any point on the Pennsylvania system. As already stated, all of them had been so delivered in New York; but we are not specially concerned with them until they crossed the line between the states. They arrived in Pennsylvania by different routes, but in all that is now important the facts concerning them are alike. Two of them crossed the line from Red House, N. Y., to Brookville, Pa., and the evidence was uncontradicted that they were then at the orders of the local agent at this point for any use or for any load. As he had no use for them at Brookville, they became part of a new train, with a new crew and a new engine, and were moved to Oil City, Pa., where they were again at the service of the local agent. He had no use for them, and again they became part of a new train, with a new crew and a new engine, and were moved to Phillipston, Pa., where they stopped for the third time and were again available for any use or load. The agent at Phillipston having no occasion to use them, they once more became part of a new train, with a new crew and a new engine, and went forward to Verona, where they took their place with many other loaded and empty cars, all awaiting assignment and use. Finally, at Verona, they were put into a new train, and here they joined the 6 other cars referred to. These also were Pennsylvania system cars, and had come from New York by different routes in different trains. They crossed the line from Olean, N. Y., to Irvineton, Pa., where they came to rest and were available for any use. From Irvineton they went on to Oil City, Pa., and from Oil City to Verona, under the same conditions as the 2 cars first spoken of. As already stated, Campbell's crew and engine took hold of these 8 and about 17 other cars at Verona in order to move them to Pitcairn, where they were to be left for the night and would all be available for such use as the railroad company might desire. At no time during the foregoing movement of the 8 cars in question was any one of them destined to a particular place or for a

particular use, except that all of them were being moved from time to time to the next railroad point where such cars were usually assembled for distribution and use. None of these cars moved forward upon a card stating a destination or upon a bill of lading.

The company admitted that Campbell was engaged in interstate commerce during the morning of October 1st, from the time he left Derry until his engine delivered the loaded coke cars at Coleman, but denied that he was so employed during the remainder of the day. Neither side asked to have this dispute submitted to the jury, and it is probable that both sides took it for granted that the judge would decide it himself. At all events he did decide it, saying to the jury:

"* * * That the facts warrant a finding that the defendant company and Campbell were engaged in interstate commerce at the time of the accident and the time of the alleged injury to Campbell, so that you need devote no attention to that question. I want to put that squarely to you, so that the court may have control of it hereafter. Therefore you need spend no time upon the evidence submitted as to whether or not the company and Campbell were both engaged, or either engaged, in interstate commerce. And you will pass to the consideration of the second question, which is the question of negligence on the part of the defendant company."

[2] This ruling was excepted to and is now assigned for error, but the error complained of is, not that the judge decided the question himself, but that he decided it in favor of the plaintiff, instead of the defendant. We shall therefore treat the case as the parties have treated it, and consider the correctness of the ruling. No doubt the movement of empty cars is an operation of commerce, and where the movement is interstate the act of Congress now in question would apply. N. Car. R. R. v. Zachary, 232 U. S. 248, 34 Sup. Ct. 305, 58 L. Ed. 591, Ann. Cas. 1914C, 159. But it is also certain that a particular interstate movement must come to an end, and that the act may cease to apply when the movement ceases. If these cars had been billed from New York state to Pitcairn, so that the journey had been defined and the end of the journey had been determined, there would be much reason in the contention that the interstate movement was still going on. On the other hand, if they had been expressly billed to Brookville and Irvineton, respectively, it would not be easy to avoid the conclusion that the interstate movement had ceased at these points, and that the movement afterwards was wholly within the state. But the evidence shows that the cars were not billed at all, and therefore, as the character of the movement depended on the uncontradicted testimony of the witnesses, we feel bound on this record to accept the facts as the witnesses state them. And, if they are so accepted, we cannot avoid the conclusion that these cars had finished their interstate journey when they reached the first halting place in Pennsylvania. They had no more distant destination; they did not leave New York with any other terminus in view; they were then immediately available for any use; in a word, to use the expressive phrase of one of the witnesses, they were "drifting," waiting to be assigned for service. Moreover, they were in the owner's possession, and he was in full control, so that they did not need to go further in order to be "at home." When, indeed, it may be asked, would such cars lose

their interstate character, if they had not lost it under the facts before us? It is difficult to see what other satisfactory test can be applied, for it is clear that they could not remain interstate cars indefinitely. They might have been sent to the repair shop at the first halting place, or have actually been used there to carry freight between Pennsylvania points, and in either event it could not be denied that their interstate character had ceased. Being bound nowhere, we think they became domestic cars after the owner had them in his possession and under his control at the first appropriate distributing point within the state. If the end of a journey has been defined, that presents one situation; if in fact the end has not been expressly determined, the law must determine it in accordance with what is reasonable and just. In the Zachary Case, there was no such evidence as is now before us; the court found it to be a reasonable inference that the cars then in question were in the process of being "carried forward as a part of a through movement of interstate commerce."

[3] But, although we would be obliged to reverse the judgment on this point alone, we think it our duty to consider the other question also, in order to avoid another trial, if possible. After a careful examination of this record we can find no evidence whatever of the failure to inspect. The brake was fastened to the end of a box car, and the short brake rod was in a horizontal position, fastened, of course, into the brake wheel. The rod broke, apparently just where the squared portion that fits into the brake wheel is rounded off to form the remaining portion of the rod. How the accident happened is uncertain. The only testimony on the subject is a declaration of Campbell to another member of the crew that "the brake twisted off, with me," and the testimony of one other witness as follows:

"Q. Did you see the brake stem?

"A. Yes, sir.

"Q. What was the condition of the brake stem, where this wheel had come off?

"A. Well, there had been a little defect right next to the wheel.

"Q. What was the defect?

"A. It was rusty.

"Q. What was it that caused the brake wheel to come off—was it that defect?

"A. Well, I don't know. It was twisted off. The iron wasn't sufficient to hold it; whether the man had pulled, or whether he had hit it, it wasn't sufficient to hold the weight. * * *

"Q. Tell the court and jury the condition of the brake shaft when you saw it.

"A. Well it had been broke off, and the iron was curled around, like a fellow would make a twist on the iron.

"Q. Then the iron had twisted, instead of holding steady and still?

"A. Yes, sir.

"Q. And where was it that the iron had broken off, how near to the place where the wheel was fastened on?

"A. Well, it had broke almost against the heavy part of the iron, or against the square.

"Q. Was a portion of the stem that held the brake wheel broken or twisted off? To make myself clear, wasn't there a piece of the stem in the wheel itself?

"A. Yes, sir.

"Q. And didn't that piece of stem to which the wheel was fastened break off?

"A. Yes; sure.

"Q. And how much below that was there of the stem that was broken off?

"A. Well, there wasn't anything that was left there except the heavy part of the iron, with this little curl on it; it was the heavy part of the brake.

"Q. Did you see that place where it had broken off?

"A. Yes, sir.

"Q. What was the condition of the place where it was broken?

"A. Well, it looked to be maybe a little defect there, for one-eighth of an inch.

"Q. How much of it was rusted in—of that crack?

"A. Well, I say I believe there was perhaps one-eighth of an inch.

"Q. And had that one-eighth of an inch rusted in all around?

"A. No, sir; I don't think it had. I didn't examine it very closely, but that was my idea."

There is no evidence how long this slight defect had existed, nor how easily it could have been seen below the brake wheel, nor how soon rust might gather in a crack, nor what might have been disclosed by such inspection as was practicable. Indeed, there is no evidence whatever concerning inspection or failure to inspect. The plaintiff asked one witness whether the records in his office showed what inspection was made of this car between Buffalo and Pitcairn; but, when the witness explained that these records were in the mechanical department, and not in his own office, the plaintiff made no further effort to prove the facts. In the absence of all testimony on this vital subject, the jury should not have been allowed to conjecture whether inspection was made, or was neglected, and what might, or might not, have been discovered by such inspection as was practicable. The burden was on the plaintiff to prove the negligence that was charged, and the evidence about inspection was at his command.

The jury should have been instructed to find for the defendant. The judgment is reversed, and a new venire is awarded.