WILLIAM W. WHEELOCK *et al.* Receivers, Plaintiffs in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(GEORGE IHRIG, Defendant in Error.)

*Opinion filed October 28, 1925—Rehearing denied December 3, 1925.*

1. WORKMEN'S COMPENSATION—*when watchman on train is engaged in interstate commerce.* A police sergeant employed by a railroad company to watch shipments of freight out of a certain city, riding whatever trains he was ordered by his superior officer to ride for a certain distance out of the city, is engaged in interstate commerce, where it was his duty to guard the freight regardless of whether it was consigned to an intrastate or interstate destination; and the fact that on the particular occasion of his injury he was guarding an intrastate shipment does not bring him within the Compensation act.

2. SAME—*when railroad employee is subject to Federal Employers' Liability act.* An employee of a railroad company is within the Federal Employers' Liability act if the employment in which he was engaged at the time of his injury was an incident to interstate commerce, even though it was also an incident to intrastate commerce.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. CHARLES V. MILES, Judge, presiding.

MILLER, ELLIOTT & WESTERVELT, (SILAS H. STRAWN, of counsel,) for plaintiffs in error.

HARRY A. ADAMS, and R. F. LEGER, (WILLIAM JOHNSON, of counsel,) for defendant in error.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

A writ of error was awarded to the receivers of the Chicago and Alton Railroad Company to review the judgment of the circuit court of Peoria county confirming an award of compensation made by the Industrial Commission against the plaintiffs in error, in favor of George Ihrig, on account of an accident arising out of and in the course of

his employment by the plaintiffs in error, which resulted in the amputation of his right leg.

The only question in controversy is the jurisdiction of the Industrial Commission, the plaintiffs in error claiming that the commission was without jurisdiction because the defendant in error at the time of the accident was employed in interstate commerce. If he was so employed his right to compensation is governed by the Federal Employers' Liability act and he has no remedy under the Workmen's Compensation act. *Staley* v. *Illinois Central Railroad Co.* 268 Ill. 356; *New York Central Railroad Co.* v. *Winfield,* 244 U. S. 147.

The accident occurred on February 26, 1923, at the Washington street crossing of the railroad in East Peoria. The defendant in error was employed, as he had been for three months, as a sergeant of railroad police on the Chicago and Alton railroad. He had been stationed at Peoria about two months prior to the accident. He testified that his duties were to guard merchandise trains, watch trains and investigate robberies, and that when he was on a train his duty was to guard the entire train, the same as the duty of Lieutenant Kidder, who was his immediate superior in Peoria, from whom he usually got his orders from day to day. On the night of the accident he was told by Kidder to go along with this train (No. 180) to guard a shipment of two cars of alcohol which the train was transporting. The destination of those two cars was Chicago, and they were placed next to the caboose at the rear of the train according to the custom to place such shipments in that position so that the special agents can ride in the caboose and be near the shipments all the time. The train started from the yards that night at ten o'clock. When it slowed up at the Washington street crossing at East Peoria, Ihrig took his revolver out of his holster, put it in his coat pocket and got off the rear of the caboose to see if there was anybody there who would cause trouble. As he jumped off the train

the revolver fell out of his pocket to the ground and ex-
ploded, sending a bullet through the calf of his right leg.
Ihrig also testified that it was not the custom of the rail-
road company to have special police on all freight trains,
but the custom was to have special police when there was
a big shipment of clothing, shoes or the like. They never
put a man on a train for heavy stuff, such as machines or
the like, but they always had a man for whisky. Lieutenant
Conway, a special agent, was sent down from Chicago to
guard those cars and was on the train for that purpose. The
train consisted, besides the two alcohol cars and the caboose,
of nine other cars,—two empty and the others loaded with
interstate and intrastate shipments,—but Ihrig testified that
his duties that night were not to guard the entire train as
well as the alcohol cars; that they were all three, Kidder,
Conway and Ihrig, put right next to the alcohol cars, and
their orders were never to leave them a minute.

G. E. Bentley, who was assistant to the chief special
agent for the receivers, whose office was in Chicago and
whose duty it was to handle the office work and give in-
structions to the men as to what they should do from day
to day, testified as to the duties of Ihrig and Kidder that
they were assigned to and stayed in Peoria permanently;
that their duties were to protect merchandise cars every
night out of Peoria, one train going south (No. 97) and
the other north to Chicago. They were to protect those
trains. They did not ride the trains as far as Chicago.
Sometimes they would ride them out as far as Washing-
ton, twelve or fifteen miles from Peoria, and other nights
they would ride them out as far as Varna, probably thirty
miles. They did not ride all the way to Chicago because
they were on duty every night and they had to be back
home early the next morning in order to get sleep to be
ready for work the next night. Any night when there was
any special car, such as an alcohol car, they would give
assistance to the man that was sent down from Chicago.

They would give him a hand; help with the car out as far as Washington; give him special help on that in addition to protecting the rest of the merchandise cars,—the balance of the train. Ihrig's and Kidder's duty was to ride the trains out of Peoria. They did not have particular trains that they were assigned to. They arranged that among themselves. They were at Peoria to look after everything in general. They did not protect the yards at Peoria or East Peoria, as those yards did not belong to the railroad company but to the Peoria and Pekin Union Railroad Company. The only duty they had was protecting merchandise cars out of Peoria in the evening or night. They were in Peoria with general directions to look out for things. The trains did not run on Sunday nights. When there was a big shipment of whisky or alcohol a man was sent from Chicago, and the local men would help him to see that those cars got out safe. When there was whisky or alcohol upon a train it was customary to place those cars close to the caboose, so that they could be watched. When robberies of such shipments occurred they were generally committed by a gang of from five to eight men. On the night of this accident there were only three men on guard on the train. It was left to Kidder's judgment whether he should ride on the train that night or what Ihrig should do, and Ihrig was subject to the orders of Kidder. Bentley testified that Ihrig's duties as given him by Bentley were to guard all merchandise in the cars of any of these trains out of Peoria on the Chicago and Alton railroad. His duties were to ride these trains whether there was alcohol in the train or not, and Bentley testified that he did ride the trains every night. Those were his instructions.

Ihrig testified that there were two trains leaving Peoria which Kidder and he were supposed to ride,—one going north, the other south,—unless there was an alcohol shipment. Then they went together and guarded the alcohol. The train on which he went this night was going north to

Chicago. He was directed to take the train after he reached the yards.

Kidder testified that there were two trains leaving Peoria every night except Sunday,—one south, at 8:00 o'clock, the other north, at 8:45,—which he and Ihrig rode, and that he arranged it so that each of them got the long and the short night alternately; that the railroad company had had a good deal of trouble in protecting its merchandise cars as well as alcohol cars, and that it was his duty and Ihrig's to protect all the merchandise on the train. Conway was sent down from Chicago only when there was alcohol on the train, and it was his duty to protect the alcohol cars. He further testified that Ihrig did not have a regular train to ride but it was mutually agreed between them; that there was no regular assignment. On the night in question he got instructions to protect this train, and he told Ihrig to go on this train with him. He met Ihrig about seven o'clock, and Ihrig got his knowledge from Kidder that there would be two car-loads of alcohol on the train. They let the south-bound train go out without anyone on it so both could go on No. 180 because of this special shipment.

Ihrig's general employment by the plaintiffs in error was in interstate commerce. He was employed to ride the freight trains and protect from theft the shipments of merchandise carried by them regardless of the character of the shipments, whether in interstate or intrastate traffic. While in the course of his employment riding a train which was transporting interstate shipments of merchandise he was employed in interstate commerce, regardless of the fact that the train was also transporting intrastate shipments which it was also his duty to guard, even though the intrastate shipments were much more valuable and much more likely to be the subject of theft than the interstate shipments and though the presence of the intrastate shipments was the cause of his being assigned to the particular train. It is the employment that determines whether or not

·the injury to the employee is within the purview of the act and not necessarily the particular act of the employee at the precise time of his injury. (*Jackson* v. *Industrial Board,* 280 Ill. 526.) If an employee of a railroad while engaged in protecting the instrumentalities of the interstate commerce of his employer is killed in the course of his employment, his injuries arise out of the employment and the case is within the scope of the Federal Employers' Liability act and not the Workmen's Compensation act. (*Chicago and Alton Railroad Co.* v. *Industrial Com.* 288 Ill. 603; *Pittsburg, Cincinnati, Chicago and St. Louis Railroad Co.* v. *Industrial Com.* 291 id. 396; *Philadelphia and Reading Railway Co.* v. *Di Donato,* 256 U. S. 327.) In each of these cases the injured employee was a flagman, whose duty it was to protect a railroad highway crossing at which the tracks were used by interstate and intrastate trains by preventing collisions between vehicles or persons using the highway and trains using the railroad tracks, and it was held that the case was within the scope of the Federal Employers' Liability act, regardless of the cause of the injury. In the case last cited it was said: "The service of a flagman concerns the safety of both commerces, and to separate his duties by moments of time or particular incidents of its exertion would be to destroy its unity and commit it to confusing controversies."

An employee is within the Federal act if the employment in which he was engaged at the time of his injury was an incident to interstate commerce even though it was also an incident to intrastate commerce. (*Kusturin* v. *Chicago and Alton Railroad Co.* 287 Ill. 306; *Erie Railroad Co.* v. *Winfield,* 244 U. S. 170.) In the latter case the employee was in charge of a switch engine engaged in moving freight cars in the railroad yard, some of which contained interstate freight, others intrastate freight and others both kinds. At the end of the day's work he took the engine to the place where it was to remain during the night,

and in passing over one of the tracks while leaving the yard he was struck by an engine and killed. In holding that the Federal act applied and not the New Jersey Workmen's Compensation act, the court said that leaving the yard at the end of his day's work was a necessary incident of the day's work and partook of the character of that work as a whole, for it was no more an incident of one part than of another. "His day's work was in both interstate and intrastate commerce, and so, when he was leaving the yard at the time of the injury, his employment was in both. That he was employed in interstate commerce is therefore plain, and that his employment also extended to intrastate commerce is for present purposes of no importance." Other cases illustrating the same principle are *Southern Pacific Co.* v. *Industrial Accident Com.* 174 Cal. 8; *Graber* v. *Duluth, S. S. & A. Railroad Co.* 159 Wis. 414; *Flynn* v. *New York, S. & W. Railroad Co.* 90 N. J. L. 451; *Southern Railway Co.* v. *Puckett,* 244 U. S. 571.

The employment of the defendant in error by the receivers was clearly in interstate commerce. His primary duty as a train rider was to ride the train on which he was riding the night he was injured and the train going south from Peoria, as he was directed by his superior officer, and to protect the train and freight in course of transportation from theft or injury, whether the cars or the freight which they contained were destined within or beyond the limits of the State. The defendant in error went out on the train in question because in the course of his duties he was directed to do so by Kidder, and the reason he was so directed and the other train was permitted to go out on that night without any train rider was the presence of the cars of alcohol in the north-bound train and the need for extra precaution in guarding those cars. This reason for taking him off of one train and putting him on another on that particular night, and the special direction to guard the alcohol cars, did not relieve him of his duty to guard the rest of

the train and the merchandise which it was carrying. He was engaged in both interstate and intrastate commerce, and in such case the liability of his employer was fixed by the Federal Employers' Liability act and not by the Workmen's Compensation act.

The circuit court therefore erred in confirming the award of the commission, and its judgment will be reversed and the award set aside.

*Judgment reversed and award set aside.*

---

(No. 16844.—Reversed and remanded.)
R. L. McCᴏʀᴍɪᴄᴋ, Appellee, *vs.* Fᴀʏ Sᴀɴꜰᴏʀᴅ *et al.*
Appellants.

*Opinion filed October 28, 1925—Rehearing denied December 3, 1925.*