(No. 21196.—

THE MISSOURI PACIFIC RAILROAD COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(JAMES R. ALEXANDER, Defendant in Error.)

*Opinion filed April 23, 1932.*

356

[redacted]

JOSIAH WHITNEL, and H. L. BROWNING, (EDWARD J. WHITE, THOMAS J. COLE, EDGAR P. HOLLY, and D. A. BUTLER, of counsel,) for plaintiff in error.

NORMAN & NORMAN, (WHEELER & OEHMKE, of counsel,) for defendant in error.

Mr. JUSTICE JONES delivered the opinion of the court:

The Missouri Pacific Railroad Company filed an application with the Industrial Commission for an adjustment of compensation, representing that on December 16, 1929, James R. Alexander, a freight conductor in its employ, was injured in an accident arising out of and in the course of his employment. Alexander resists the application by contending that the Workmen's Compensation act does not control the liability because he was engaged in interstate commerce at the time of the accident. The Industrial Commission found that he was so engaged and that the commission was without jurisdiction. Upon petition of the railroad company the cause was removed by writ of *certiorari* to the circuit court of St. Clair county. That court quashed the writ and confirmed the decision of the Industrial Commission. The cause comes to this court by writ of error.

The Missouri Pacific Railroad Company has a large terminal at Dupo, Illinois, a short distance south of East St. Louis. Trains are made up and disassembled there.

Cars are classified and distributed in the train yards. The railroad company also maintains yards farther south, at Bush, Illinois, where trains and cars are handled en route to and from the coal fields of southern Illinois. On December 16, 1929, Alexander was in charge of a south-bound Missouri Pacific freight train running from Dupo to Bush. The train consisted of an engine, 116 empty coal cars, one empty box-car and a caboose. It had been assembled in the Dupo yards. The box-car belonged to the St. Paul, Minneapolis and Sault Ste. Marie Railroad Company (Soo Line). It was received by the Missouri Pacific at Dupo, without any bill of lading, at 9:55 A. M. on that day from the Terminal Railroad Association, which had hauled it across the river at St. Louis, Missouri. Empty cars arriving at Dupo without billing are inspected, classified and assigned for use according to their physical condition and the kind of commodity they are fitted to carry. The superintendent of the Dupo yards had general instructions from his superior as to the distribution and disposition of cars. One was, to send all Soo Line box-cars fit for coal loading to the coal fields. The superintendent ascertains each morning how many coal cars are available in the yards and estimates the number which will come in during the day. From the trainmaster at Bush he learns how many cars will be needed in the coal fields and where they are to be sent. Each evening the trainmaster learns from the mines the number of cars each mine will require for loading the next day. Such needs are anticipated by placing cars on the mine switches the day before the orders are received. Such a plan requires a frequent movement of coal cars into the Bush yards. When the train left Dupo the Soo Line car was the only one which had a way-bill. It was called an "empty-car way-bill and home-route card." It showed the car was billed from Dupo to Herrin for Soo Line coal loading on authority of the superintendent of transportation of the Missouri Pacific railroad. Home-route cards are at-

tached to empty foreign cars in order that they may be expeditiously returned to the proper place to save a per diem charge of one dollar. Herrin, Illinois, is in the southern coal fields of the State, near the Bush terminal, and the billing to that point was indicated on the way-bill as "first local move." The billing did not confine the trip and the use of the car to the terms of the way-bill. If the trainmaster had occasion to do so he could divert it to some other point to be loaded with some other commodity. Such diversions were practiced. On December 18, two days after the accident to Alexander, the Soo Line car was loaded with coal and billed from Jeffries, Illinois, to the Soo Line at Wheeling, Illinois, a short distance north of Chicago. Alexander received a train order to meet and pass Missouri Pacific interstate train No. 1314 at Flinton, about forty-three miles south of Dupo. This train was bound from Poplar Bluff, Missouri, to Dupo. At Flinton, Alexander was in the caboose of his train, which was moving slowly along the passing track. He heard another train approaching from the south and saw the reflection of its headlight in the south windows of his caboose. He testified that he had two duties: First, to observe the number on the engine so as to ascertain if it was the train he was to meet at that point; and second, to make a "running inspection" of the passing train—that is, to watch for anything wrong, such as hot boxes and broken wheels. Upon discovering any such defect it would become his duty to signal the passing train to stop. When Alexander heard the train approaching he got up from his desk and started to walk toward the side door of the caboose to carry out his duties. Just before he reached the door, and before the approaching engine had reached his caboose, a sudden jerk of his train threw him against a washstand, resulting in his injury.

The first question to be considered is whether or not the movements of the Soo Line car from St. Louis, Missouri, to Dupo, Illinois, fix the character of its subsequent

trip from Dupo as interstate. At the time the trainmaster ordered the train made up at Dupo he had no orders from any of the coal companies for the next day. He was merely anticipating a future ·need. The train left Dupo about 4:30 P. M. It was not then known to what prticular places the cars would go or with what commodity the Soo Line car would be loaded or to what destination it would be sent. When the Soo Line car arrived at Dupo it had finished an interstate trip and had not begun any other. It was "drifting"—waiting to be assigned for service. (*Pennsylvania Railroad Co.* v. *Knox,* 134 C. C. A. 426.) It is upon these facts that the first question must be determined.

In *New York Central and Hudson River Railroad Co.* v. *Carr,* 238 U. S. 260, it is said: "The mere fact that they [a train of empty cars] might soon thereafter be used in interstate business did not affect their intrastate status at the time of the injury, for if the fact that a car had been recently engaged in interstate commerce, or was expected soon to be used in such commerce, brought them within the class of interstate vehicles, the effect would be to give every car on the line that character." The right of recovery under the Federal Employer's Liability act arises only where the injury is suffered while the carrier is engaged in interstate commerce and while the employee is employed by the carrier in such commerce. (*Illinois Central Railroad Co.* v. *Behrens,* 233 U. S. 473.) After an interstate journey of empty cars has come to an end at its intended destination in another State, a subsequent new and independent movement between two points in the same State does not constitute a movement in interstate commerce. (2 Roberts on Federal Liability of Carriers, (2d ed.) p. 1093.) The mere fact that the Soo Line car came from Missouri into Illinois shortly before it began the trip in Alexander's train did not fix the character of that trip as an interstate transaction, and we conclude that the Soo Line car was not in interstate commerce in its trip from Dupo.

The next question is whether Alexander was engaged in interstate commerce at the time he was injured. It is claimed that because he was on his way to make a running inspection of the passing train his employment at the time pertained to interstate transportation. That question is to be decided by the test of whether the employee at the time of the injury was engaged in interstate transportation or in work so closely related to it as to be practically a part of it. (*Chicago and Alton Railroad Co.* v. *Industrial Com.* 290 Ill. 599; *Shanks* v. *Delaware, Lackawanna and Western Railway Co.* 239 U. S. 556.) It is the employment that determines whether or not the injury to the employee is one within the purview of the act and not necessarily the particular act of the employee at the precise time of his injury. (*Wheelock* v. *Industrial Com.* 318 Ill. 537.) Alexander's employment was for the transportation of 117 empty cars in intrastate commerce. The running inspection which he was to give another train as it passed him had nothing to do with the operation of his train. Not every employee of an interstate carrier is engaged in interstate commerce. In order for an employee to be so engaged his work must constitute a real and substantial part of the interstate commerce in which the carrier is engaged. (*Chicago and Alton Railroad Co.* v. *Industrial Com. supra.*) It is the duty of every railroad employee, independent of any rule, to report any defect he may observe in road-bed or equipment which might delay or hinder transportation or result in an injury. Such an incidental duty is not a real and substantial part of interstate transportation nor was the work so closely related to it as to be a part of it, otherwise practically every employee in the operating department of a railroad company would be considered as engaged in interstate transportation at all times when he is on duty. We are of the opinion that the running inspection was not such a direct, material and substantial part of Alexander's employment as to bring him within the scope of the Fed-

eral Employer's Liability act. The Supreme Court of the United States has rigidly followed the rule announced in *Shanks* v. *Delaware, Lackawanna and Western Railway Co. supra,* ever since it was announced. One of the last expressions of that rule is found in *Chicago and Northwestern Railroad Co.* v. *Bolle,* 52 Sup. Ct. 59, where it is said: "The test of whether an employee at the time of his injury is engaged in interstate commerce, within the meaning of the act, naturally must be whether he was engaged in interstate transportation or in work so closely related to such transportation as to be practically a part of it." Applying that test, Alexander's work cannot be deemed of that character.

It was necessary for Alexander, in executing his running orders in passing train No. 1314, to go to the side door of his caboose, where he could see the number of the engine on the passing train and thereby ascertain if that train was the one mentioned in his orders. His primary duty was to ascertain that fact. It was a real and substantial part of the employment in which he was then engaged while the making of a running inspection of the passing train was an incidental duty. The so-called "first step" doctrine has no application to the facts in this case, because the work Alexander was engaged in was not so closely related to interstate transportation as to be a part of it.

The award of the arbitrator was for complete total disability. The testimony shows that at the time of the hearing Alexander was managing a filling station, selling gas and oil. As to the extent of his disability we express no opinion.

The judgment of the circuit court is reversed and the cause is remanded to the circuit court, with directions to remand the cause to the Industrial Commission to determine the nature and extent of Alexander's disability and to make an award therefor.

*Reversed and remanded, with directions.*