## HEFFNER v. PENNSYLVANIA R. CO.

### MINCHHOFF v. SAME.
#### Nos. 201, 202.

Circuit Court of Appeals, Second Circuit.
Jan. 13, 1936.

Burlingham, Veeder, Clark & Hupper, of New York City (Ray Rood Allen, of New York City, and Allan B. Lutz, of Brooklyn, N. Y., of counsel), for appellant.

Thomas J. O'Neill, of New York City (Jeremiah J. Riordan, of New York City, of counsel), for appellees.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

Clayton R. Heffner and Frank J. Minchhoff were employees of the defendant railroad. They were killed in a collision between two trains of the defendant, which occurred on the night of March 22, 1934, near Norris Tower, Pa., and their respective personal representatives brought these actions under the Federal Employers' Liability Act (45 U.S.C.A. § 51). Each plaintiff recovered a verdict and judgment, from which the defendant has appealed. The primary question is whether there was sufficient evidence to support a verdict that the decedents were engaged in interstate commerce at the time of the collision.

Heffner was brakeman and Minchhoff was conductor of one of the colliding trains, consisting of an engine, tender, and caboose. This train left Philadelphia shortly after 8 p. m. on the fatal evening under orders to proceed light to Marsh, Pa., to pick up 89 empty coal cars. At Norris Tower the train backed onto a Y track leading to a storage yard at Marsh, and it was during this backing movement and before the yard was reached that the caboose came into collision with the rear end of a standing train. There was no direct testimony as to what cars conductor Minchhoff's train was to pick up nor where they were to be taken, but the plaintiffs contend that the evidence justifies an inference that the decedents were to get a string of empty "hoppers," that is, coal cars, and continue an interstate movement of them which had begun at South Amboy, N. J., on the morning of the same day. If so, the decedents were engaged in interstate commerce within the ruling of North Carolina R. R. Co. v. Zachary, 232 U.S. 248, 259–260, 34 S.Ct. 305, 58 L.Ed. 591, Ann.Cas.1914C, 159.

Marsh Yard is a storage yard, used chiefly for coal cars, on the Philadelphia Division, and is a division interchange point for the Wilkes Barre Division, the Philadelphia Terminal Division, and the Harrisburg Division. About 1.30 p. m. on March 22d an interstate train from South Amboy under the direction of Conductor Gemperling dropped off at Marsh Yard a string of 91 empty coal cars belonging to the defendant. Eighty-nine of them were left coupled together on one track, and for lack of room two cars were placed on another. The 91 cars so left were not "billed" or "carded," nor was there any testimony that any destination beyond Marsh had been designated for them when they set out from South Amboy or at any time before the fatal accident. On the afternoon of the day following the accident, an engine in charge of Detwiler was sent to Marsh, to pick up empties. Arrived there, he was assigned 70 of these cars, and received orders to move them to Mt. Carbon, Pa., a station on the Wilkes Barre Division and in the coal region. Only 40 were actually taken there, because while en route Detwiler received orders to leave 10 cars at Reading and 20 on a siding near Schuylkill Haven. The hoppers from South Amboy were not the only empty hoppers in Marsh Yard on the evening of the accident. One witness testified that the total number was approximately 200. The operator at Marsh testified without contradiction that empty cars left at Marsh Yard were subject to his direction and he could release what cars he pleased to fill a call for empty hoppers. This was

said to be true of the hoppers left by Conductor Gemperling. Although more commonly used to carry coal, hoppers are not necessarily so used; sometimes they are sent to quarries for stone.

To sustain their claim as to interstate commerce, the plaintiffs had to prove (1) that Heffner and Minchhoff were on their way to pick up the particular hoppers that had come in from South Amboy, and (2) that those hoppers had not yet ended their interstate journey, but were to be picked up and moved in furtherance of it. The order given to Conductor Minchhoff at Philadelphia to proceed to Marsh for 89 empty hoppers did not identify the cars he was to get, except in so far as an inference may be drawn from the correspondence in number that he was to take the string that Gemperling had left coupled together on one track. Such an inference seems somewhat speculative, in view of the presence of other cars and the testimony of the Marsh operator that he was free to designate the cars to be taken. But, even if it be assumed that there was evidence for the jury on this issue, we think the evidence was insufficient on the second point; namely, that the cars were to be picked up in furtherance of an interstate movement of them.

Empty coal cars which are being brought "home" from without the state by the carrier owning them will ultimately, in all probability, reach some point in the coal fields where they are needed for loading coal. But it does not follow that their interstate journey should be deemed to continue until that point is reached. On the contrary, it seems a more realistic view to say that the interstate journey ends at the first place within the home state where they are dropped off to await a decision by the carrier as to the service in which they shall be used. Such halt is not merely incidental to their journey to loading points, but is a cessation of their activities for a time, during which the railroad may decide to do any number of things with them. Possibly it may send them to a repair shop, or loan them to some other company, or send them back along the way they had come, rather than onward to the coal regions—all this after the lapse of such interval of time as may occur before the decision is reached. In short, at that point they become "drifters," waiting to be assigned to service, bound nowhere, and requiring a further designation to place

them again in the stream of interstate commerce. So the courts have held in the few cases found which have discussed the point. Pennsylvania R. R. Co. v. Knox, 218 F. 748, 751 (C.C.A.3); Philadelphia & Reading Ry. Co. v. Cannon, 296 F. 302, 304 (C.C.A.3); Mo. Pac. R. R. Co. v. Industrial Com., 348 Ill. 355, 358, 180 N.E. 912; Louisville & N. R. R. Co. v. Strange's Adm'x, 156 Ky. 439, 448, 161 S. W. 239; Chicago & Erie R. R. Co. v. Feightner, 75 Ind.App. 677, 114 N.E. 659. Hence it was necessary for the plaintiffs to show that the cars in question had an assigned destination beyond Marsh at the time they were left there. There was no evidence to justify such a finding. They were not billed or carded for any destination. Gemperling said that Marsh was the usual place for dropping such cars, and he dropped them there. It is a fair inference from Krail's testimony that the cars Minchhoff was to get were to be taken to some destination on the Schuylkill Valley (Wilkes Barre) Division, but the decision to send them there is as likely to have been made just before Minchhoff got his order in Philadelphia at 8 p. m. as to have been made prior to their arrival at Marsh at 1.30 p. m. Indeed, the uncontradicted testimony that empties left there were moved out as the Marsh operator directed strongly militates against the cars having had a definite destination beyond Marsh at the time of their arrival. And the fact that 40 of them were taken to Mt. Carbon by Detwiler the following day is as equally consistent with the assignment of that destination after the cars reached Marsh as before. It proves nothing. Any inference that Mt. Carbon was their destination when they began their interstate journey at South Amboy would be pure speculation.

The plaintiffs rely upon Hester v. East Tenn. & W. N. C. R. Co., 254 F. 787 (C. C.A.4). There the court held that it was a jury question whether certain narrow gauge ore cars which had been carried to Blevins, Tenn., within a few miles of the North Carolina line, were destined for a smelter across the border. It was shown that the regular practice was to take the narrow gauge ore cars from Blevins into North Carolina, and the jury was allowed to infer that the particular cars would have followed that practice. But Blevins was not a storage yard where assignment of cars was made, as at Marsh. The case

is plainly distinguishable from the authorities cited above relating to distributing points where cars come to rest to await assignment for service.

Therefore, even on the assumption that the jury could find that Heffner and Minchhoff were going to pick up the string of 89 cars that had come from South Amboy, the evidence would not support a finding that those cars were still in interstate commerce. The motion for a directed verdict on this ground should have been granted.

■ The defendant asks us to direct dismissal for lack of jurisdiction rather than to remand for a new trial. But the authority relied upon in support of this request, Baltimore & Carolina Line, Inc. v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636, does not justify it. In that case decision of the motion was reserved until after verdict; here it was not; and Slocum v. New York Life Insurance Co., 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879, Ann. Cas. 1914D, 1029, controls.

■ If there is a new trial, evidence as to the funeral expenses should be excluded. Delaware, L. & W. R. R. Co. v. Hughes, 240 F. 941 (C.C.A.2); Philadelphia & R. R. Co. v. Marland, 239 F. 1 (C.C.A.3).

Judgments reversed, and causes remanded.